IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RODNEY G. FREEMAN, | ) | |
| | ) | 4:04cv3266 |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER |
| vs. | ) | |
| | ) | |
| HAROLD W. CLARKE, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on filing no. 29, the "Motion for Summary Judgment on the Pleadings" filed by the plaintiff, Rodney G. Freeman; and filing no. 31, the "Cross-Motion for Summary Judgment" filed by the defendants, Harold W. Clarke, et al. The plaintiff, a prisoner in the custody of the Nebraska Department of Correctional Services ("DCS"), challenges the manner and duration of his removal from the general prison population of the Nebraska State Penitentiary ("NSP") and his placement in segregation from May 14, 2002 until July 24, 2002. The plaintiff also protests his transfer from the NSP to the Tecumseh State Correctional Institution ("TSCI") on July 26, 2002.

The plaintiff contends that the defendants deprived him of liberty without due process by placing the plaintiff in Immediate Segregation ("I/S") and keeping him there despite evidence of his innocence of any misconduct. Then, according to the plaintiff, the defendants again deprived the plaintiff of liberty without due process by leaving him in segregation, despite dismissal of the disciplinary charges against him, when they reclassified his security status to Administrative Confinement ("A/C"). The plaintiff attributes retaliatory motives to the defendants because of a prior lawsuit and accuses them of conspiracy to deprive him of his prison job at TEK Industries so that he could be

1

transferred to TSCI, the State's new maximum security prison.

As discussed below, the plaintiff's motion (filing no. 29) will be denied, and the defendants' motion (filing no. 31) will be granted. The Due Process Clause of the Fourteenth Amendment does not mandate due process of law absent a constitutionally protected liberty or property interest. The plaintiff had no such interest in the circumstances of this case, and, therefore, he had no entitlement to procedural safeguards. In addition, the defendants' conduct did not amount to an abuse of official power that "shocks the conscience," i.e., a violation of substantive due process.

## Disciplinary Proceedings

As set forth in the plaintiff's complaint, as amended (filing nos. 1 and 19) and the record, the events began with a search of the plaintiff's cell on May 14, 2002, yielding contraband and gambling paraphernalia. The plaintiff and his cellmate, Joseph Stuart, were present when Corrections Officer Lee Moore, with assistance from Officer Mitzi Doan, searched the cell and discovered the following: a bag of tobacco, 10 brown patches, 51 pink pills, 2 rolling papers, 1 altered cup, 1 bag of pepper, 145 adhesive labels in a roll, 1 pharmacy scale, 6 BIC lighters, 1 altered light bulb, 2 large onions, 1 pair leather lifting gloves, 17 sheets of labels, 1 racquetball racquet, 1 leather pouch with 26 tokens, 1 gold colored earring, and 8 pieces of paper with names and dollar amounts written on them.

May 14, 2002

The plaintiff and Stuart were held in the turnkey area of the NSP for several hours, and Officers Ronald Bailey and Christopher Connelly questioned Stuart. Stuart acknowledged that the pink pills (which testing later confirmed as Benadryl) and tobacco were his. Agreeing with the recommendation of Officers Bailey and Connelly, Captain

2

Doug Diltz placed the plaintiff and Stuart in I/S. The plaintiff received misconduct reports from Officers Moore and Dean relating to the items seized in the search. He also received a "Notice of Immediate Segregation Review" informing him of his placement on I/S pending a hearing before a Disciplinary Committee, completion of an investigation, and for the safety and security of the institution.

<u>May 15, 2002</u>

On May 15, 2002, a Review Committee comprised of Case Worker Doug Wetzel and Case Manager Curtis Moffat conducted the first review after the plaintiff's placement on I/S. The Review Committee continued the plaintiff's placement on I/S until further notice citing the following reasons: a hearing before the Disciplinary Committee is pending; an investigation is pending regarding an alleged violation of the Code of Offenses, and "other: for the safety and security of the institution." As "evidence relied upon," the Immediate Segregation Review sheet stated: "Your possession of numerous unauthorized prescription medication and for the safety and security of the institution."

<u>May 16-June 9, 2002</u>

The plaintiff received additional segregation reviews on May 21, 2002, May 28, 2002, and June 4, 2002, limited to case file reviews. Each resulted in continuation of the plaintiff's segregation. During that period, the plaintiff wrote inmate interview requests ("kites") to Warden Michael Kenney and Deputy Warden Teresa Predmore complaining that Stuart's confession to Bailey and Connelly had removed any basis for keeping the plaintiff in segregation. Stuart sent kites to Kenney and Predmore reiterating that he had informed Bailey and Connelly of his sole responsibility for possession of the Benadryl tablets and gambling paraphernalia and questioning why the plaintiff remained on I/S.

Responding to the plaintiff's May 15 kite on May 23, 2002, Warden Kenney instructed the plaintiff just to wait for the outcome of the disciplinary proceedings on the misconduct reports. A disciplinary hearing was scheduled for May 28, 2002 on all misconduct reports against Stuart except for the matter concerning the Benadryl pills, but the plaintiff's hearing was set for June 6, 2002. Then Stuart's final hearing and the plaintiff's disciplinary hearing on his misconduct reports were delayed until June 10, 2002. The delayed resolution of the plaintiff's disciplinary proceedings meant that the plaintiff would be terminated from his job at TEK Industries[1] for excessive absences. Thus, the plaintiff sent a kite on May 18, 2002 to Officer Susan Phinney inquiring why his hearing date was to be delayed beyond Stuart's. Phinney replied on May 20, that both inmates should both appear on the same date. The plaintiff did indeed lose his job at TEK as of June 6, 2002, as a result of his extended placement in segregation.[2]

June 10, 2002

Stuart has submitted an Affidavit (filing no. 34, Ex. 60) reporting that he received four misconduct reports for the contraband found in the cell. On June 10, 2002, he appeared before the Disciplinary Committee regarding the confiscated Benadryl tablets. At that time, he again took full responsibility for the pills, and received sanctions.

---

[1] "TEK is a private corporation that runs a manufacturing facility in the [Nebraska State Penitentiary], at which approximately 120 inmates are employed. Because TEK pays employees at least the minimum hourly wage, employment at TEK is desirable and competitive." Jones v. TEK Industries, Inc., 319 F.3d 355, 357 (8th Cir. 2003). The plaintiff had worked at TEK for four years before terminated for absenteeism as a result of his prolonged period on I/S.

[2] DCS had a policy or practice of allowing TEK employees to remain at NSP instead of transferring them to TSCI. When the plaintiff lost his job at TEK, he became eligible for transfer to TSCI.

On June 10, 2002, the Institutional Disciplinary Committee dismissed the plaintiff's two misconduct reports issued by Moore and Dean. As the reason for the dismissal, the Disciplinary Committee noted Stuart's acceptance of responsibility for the misconduct. Thus, June 10, 2002 marked the end of the disciplinary proceedings against the plaintiff, and the plaintiff expected to be returned to the general prison population.

### Classification Proceedings

Instead, the plaintiff received notice that the Unit Classification Committee would be considering him for placement on Administrative Confinement ("A/C"), a security classification involving nondisciplinary segregation. After a hearing on June 25, 2002, and despite dismissal of the disciplinary charges, the plaintiff was assigned to A/C. He remained on A/C status until his return to the general prison population on July 24, 2002. On July 26, 2002, DCS transferred the plaintiff to TSCI. The conditions of confinement on A/C did not differ in any significant respect from those on I/S, and both forms of custody are substantially more restrictive than conditions in the general prison population.

### The Plaintiff's Claims

The plaintiff contends that "all inmates, including Plaintiff, have a right to be free of segregation, to remain in general population, and to not be deprived of this liberty interest without being accorded the appropriate due process prescribed by law, whether that segregation be imposed under the title of 'disciplinary' or 'administrative' action" (filing no. 1 ¶ 51). According to the plaintiff, his placement on I/S and A/C deprived him of "liberty, property, and due process (procedural and substantive)" (id. ¶ 61), and the defendants conspired to: (a) subject the plaintiff to loss of liberty and segregated isolation; (b) retaliate for the plaintiff's previous lawsuit; (c) cause the plaintiff to lose his job at TEK; and (d)

5

secure the plaintiff's transfer to TSCI once he lost the exemption from transfer enjoyed by TEK employees. (Id.) In addition, in the plaintiff's view, the cumulative effect of the wrongs visited upon him amounted to a violation of substantive due process as well as procedural due process, i.e., his classification to administrative confinement based on dismissed disciplinary charges constituted an arbitrary deprivation of liberty.

## Due Process [3]

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005). Thus, claims regarding the right to either procedural or substantive due process must begin with identification of a protected liberty or property

---

[3] In addition to their rejection of the plaintiff's due process claim, the defendants seek summary judgment on the basis of 42 U.S.C. § 1997e(e), which states: "Limitation on recovery. No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." However, the defendants misconstrue § 1997e(e), which does not negate standing even if the plaintiff suffered no physical injury.

The absence of physical injury does not bar the claim itself but merely limits available remedies. See, e.g., Royal v. Kautzky, 375 F.3d 720 (8th Cir. 2004), cert. denied, 125 S.Ct. 2528 (2005). 42 U.S.C. § 1997e(e) does not bar recovery of nominal and punitive damages, or declaratory and injunctive relief, even absent compensable injury. Id., 375 F.3d at 723 ("To the extent Royal argues nominal damages, punitive damages, and injunctive and declaratory relief are available to him, we agree. Congress did not intend section 1997e(e) to bar recovery for all forms of relief."). See also Mitchell v. Horn, 318 F.3d 523, 533 (3d Cir. 2003): "Section 1997e(e)'s requirement that a prisoner demonstrate physical injury before he can recover for mental or emotional injury applies only to claims for compensatory damages. Claims seeking nominal or punitive damages are typically not 'for' mental or emotional injury but rather 'to vindicate constitutional rights' or 'to deter or punish egregious violations of constitutional rights,' respectively .... Accordingly, regardless how we construe § 1997e(e)'s physical injury requirement, it will not affect [an inmate's] ability to seek nominal or punitive damages for violations of his constitutional rights." 42 U.S.C. § 1997e(e) provides no support for the defendants' motion.

6

interest. Singleton v. Cecil, 176 F.3d 419, 424-25, 425 n. 7 (8th Cir.) (*en banc*), cert. denied, 120 S.Ct. 402 (1999).

In order to constitute a liberty interest, an individual must have a legitimate claim or entitlement to the subject of the deprivation which rises to more than a unilateral hope, or expectation. Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 459 (1989). A protected liberty interest may arise from either the Due Process Clause of the United States Constitution, itself, or from a state-created statutory entitlement. Hewitt v. Helms, 459 U.S. 460, 466 (1983); Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002) (citations omitted).

"Liberty" Inherent in the Due Process Clause

The Due Process Clause of its own force does not afford a prisoner a liberty interest in remaining in the general prison population. Lekas v. Briley 405 F.3d 602, 607 (7th Cir. 2005). See also Holly v. Woolfolk, __ F.3d __, 2005 WL 1661528 at *1 (7th Cir. July 18, 2005) ("being placed in segregation is too trivial an incremental deprivation of a convicted prisoner's liberty to trigger the duty of due process"). Accord Christianson v. Clarke, 932 F. Supp. 1178, 1182 (D. Neb. 1996) ("[T]he Due Process Clause itself does not protect any liberty interest in remaining free from administrative segregation or protective custody.").

Similarly, interprison transfers, in and of themselves, do not trigger due process protections, because convicted prisoners have no liberty interest under the Due Process Clause in being assigned to any particular cell or facility. Hewitt v. Helms, 459 U.S. at 468 (transfer to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence). See also Meachum v. Fano, 427 U.S. 215, 224 (1976) (transfer to a maximum security facility with less favorable conditions, even where the transfer causes a "grievous loss" to the inmate,

7

is "within the normal limits or range of custody which the conviction has authorized the State to impose"); Montayne v. Haymes, 427 U.S. 236, 242 (1976) ("The [Due Process] Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive"). Therefore, "the notion of liberty inherent in the Fourteenth Amendment Due Process Clause is not implicated by" a placement or transfer which subjects a convicted prisoner to more severe conditions of confinement, without more. Meachum v. Fano, 427 U.S. at 225 (interprison transfer).[4]

State-Created Liberty Interest

Consequently, the plaintiff's liberty interest, if any, must emanate from state law. The plaintiff's claim to a state-created liberty interest is governed by the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995). "Sandin found no liberty interest protecting against a 30-day assignment to segregated confinement because it did not 'present a dramatic departure from the basic conditions of [the inmate's] sentence.'" Wilkinson v. Austin, 125 S.Ct. at 2394, *quoting* Sandin, 515 U.S. at 485.

In Sandin, the Court substantially narrowed the circumstances in which a state-created liberty interest arises:

The time has come to return to the due process principles we believe were

---

[4]For a convicted state prisoner, a liberty interest traceable to the Due Process Clause itself, instead of to state law, is limited only to freedom from restraints which "exceed[ ] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." Sandin v. Conner, 515 U.S. 472, 484 (1995). "Examples would be involuntary administration of psychotropic medication, see Washington v. Harper, 494 U.S. 210, 221-22 ... (1990), or involuntary transfer to a state mental hospital for treatment, see Vitek v. Jones, 445 U.S. 480, 494 ... (1980)." Mitchell v. Horn, 318 F.3d 523, 531 n. 4 (3d Cir. 2003), *citing* Sandin, 515 U.S. at 484.

> correctly established and applied in Wolff and Meachum. Following Wolff, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause .... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 483-84 (citations omitted). Therefore, to demonstrate a liberty interest created by state law, the plaintiff must show that the protested conditions exceed the normal range and limits of custody and impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id.

However, the Eighth Circuit has "consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin." Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002). Accord Kennedy v. Blankenship, 100 F.3d 640, 642 n. 2, 643 (8th Cir.1996) (placement in punitive isolation was not an atypical and significant deprivation even though the prisoner faced restrictions in privileges regarding mail, telephone, visitation, commissary, and personal possessions). See also Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003): "We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship." The absence of contact visitation, exercise privileges, and chapel rights for 37 days did not constitute an atypical and significant hardship. Id.

In Nebraska, deprivation of good-time credit implicates a liberty interest sufficient to require due process. Dailey v. Nebraska Dept. of Corr. Servs., 578 N.W.2d 869, 873 (1998). See generally Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974) (when a state provides a right to good time and specifies the methods of forfeiture, an inmate has a

9

constitutionally-protected liberty interest entitling him or her to procedures designed to ensure that the state-created right is not arbitrarily abrogated).

On the other hand, the Nebraska courts have rejected the argument that segregation is an atypical and significant hardship giving rise to a liberty interest under state law. See, e.g., Martin v. Curry, 690 N.W.2d 186, 192 (Neb. App. 2004) (inmate had no clearly established liberty interest when prison officials extended his tentative release date from disciplinary segregation and placed him on administrative confinement). See also Thompson v. Nebraska Dept. of Correctional Services, 2002 WL 857327 (Neb. App. May 7, 2002): "Thompson has no protected liberty interest that was violated by her placement in disciplinary segregation. Disciplinary segregation alone is not an atypical and significant hardship, and Thompson does not have a state-created right that is being arbitrarily abrogated, because her good time is not affected." Id., 2002 WL 857327 at *6.

Allegations Regarding Motive and Conspiracy

In the absence of an "atypical and significant hardship," a change in conditions of confinement does not inflict an injury cognizable under the Due Process Clause, even if prison officials harbor punitive motives. The Court in Sandin rejected the argument that action taken for punitive purposes necessarily implicates a liberty interest: "Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation." Sandin v. Conner, 515 U.S. at 484 (distinguishing convicted prisoners from pretrial detainees who "may not be punished prior to an adjudication of guilt in accordance with due process of law"). As to convicted prisoners, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed

by a court of law." Id. at 485.

Thus, the plaintiff's accusations of conspiracy, pretext, punitive purpose or improper motive cannot create a liberty interest where none otherwise exists. The factors bearing on whether placement in segregation imposes the kind of atypical and significant hardship which gives rise to a liberty interest are objective, i.e.: (1) the conditions of confinement in segregation; (2) the length of time spent in segregation; and (3) the effect, if any, on the duration of the prisoner's incarceration. Sandin v. Conner, 515 U.S. at 486-87.

In Wilkinson v. Austin, 125 S.Ct. 2384 (2005), for example, despite the usual rule that an interprison transfer to a maximum security facility with less favorable conditions is within the normal limits of a conviction, transfer to Ohio's "Supermax facility (OSP)," unquestionably gave rise to a liberty interest under the principles expressed in Sandin. Conditions there are more restrictive than any other form of incarceration in Ohio, including conditions on death row. Id. at 2389. Placement at OSP lasts for an indefinite period, limited only by an inmate's maximum prison term, and parole eligibility while at OSP is suspended. Id.[5]

---

[5]"For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in Sandin, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration.... **While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context**. It follows that respondents have a liberty interest in avoiding assignment to OSP." Wilkinson v. Austin, 125 S.Ct. 2384, 2394-95 (2005) (emphasis added).

11

Allegations of Retaliation

In certain circumstances, retaliation for the exercise of a constitutionally protected right may give rise to a claim on which relief may be granted, even as to a convicted prisoner. However, no claim is stated when the alleged retaliation arises from an actual violation of prison regulations. Cowans v. Warren, 150 F.3d 910, 911 (8th Cir. 1998), *citing* Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (*per curiam*). See also Moore v. Plaster, 266 F.3d 928 (8th Cir. 2001), cert. denied, 535 U.S. 1037 (2002):

> We have long recognized an inmate's cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for the inmate's exercise of his constitutional rights .... However, claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule .... Thus, a defendant may successfully defend a retaliatory-discipline claim by showing "some evidence" that the inmate actually committed a rule violation.

Id., 266 F.3d at 931(citations omitted). In this case, a violation of prison rules certainly occurred.

Furthermore, the defendants were not required to accept Stuart's claim of sole responsibility for the violation. In fact, even after the defendants accepted Stuart's responsibility for the misconduct, the plaintiff's close proximity to the contraband found in the cell he shared with Stuart could reasonably have provoked questions concerning the plaintiff's prior knowledge of the misconduct. That the defendants decided to wait a period of observation before releasing the plaintiff into the general inmate population does not seem unreasonable, let alone shocking or outrageous. In fact, the dismissal of misconduct charges does not render the underlying information irrelevant to the assessment of prison security risks. See generally Hewitt v. Helms, 459 U.S. at 474:

> As we said in Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981), "a

> prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," ....

(Citation omitted.)

Loss of Employment

Finally, the plaintiff's loss of employment does not create rights under the Due Process Clause. Notwithstanding that the plaintiff lost a valuable job at TEK Industries and a substantial income, a prisoner has no property interest or constitutional right to retain any particular prison job. Mitchell v. Kirk, 20 F.3d 936, 938 (8th Cir. 1994); Hamm v. Moore, 984 F.2d 890, 893 (8th Cir. 1992); Flittie v. Solem, 827 F.2d 276, 279 (8th Cir. 1987) (*per curiam*).

In short, the plaintiff's period in segregation was relatively short. The conditions there were not "outside the ordinary realm of what is to be expected of prison life,"[6] and the placements in I/S and A/C had no effect on the overall duration of the plaintiff's period of imprisonment. The plaintiff had no liberty or property interest arising under the Due Process Clause itself or state law, and, therefore, he did not suffer a deprivation of liberty or property entitling him to due process.

---

[6] Christianson v. Clarke, 932 F. Supp. 1178, 1182 (D. Neb. 1996), *citing* Sandin.

THEREFORE, IT IS ORDERED:

1. That filing no. 29, the "Motion for Summary Judgment on the Pleadings" filed by the plaintiff, Rodney G. Freeman, is denied;

2. That filing no. 31, the "Cross-Motion for Summary Judgment" filed by the defendants, Harold W. Clarke, et al., is granted insofar as filing no. 31 is consistent with this Memorandum and Order;

3. That the plaintiff's complaint and this action are dismissed with prejudice, and

4. That a separate judgment will be entered accordingly.

August 8, 2005.   BY THE COURT:

/s *Richard G. Kopf*
United States District Judge